"ANNETTE CAPRERI", Petitioner, *v.* "ROBERT CAPRERI", Respondent.*

Domestic Relations Court of the City of New York, Family Court, Bronx County, July 28, 1953.

*Sidney H. Rosen* for petitioner.

*John J. Mangini* for respondent.

PANKEN, J. It is apparent from the testimony submitted in this case on behalf of both sides that there might have been a possibility of a continuous marital relationship between the petitioner and respondent were they living separate and away from the parents of the petitioner. It is apparent from the evidence that the petitioner herein is unduly attached to her parents. It is equally apparent from the evidence in the case that the respondent has resented that, and resented it very strongly.

Under the common law, which has been adopted to a degree by our system of law, the wife is obligated to live with her husband in a home which he is obliged to provide. I think that law is good. It would be a little better even were the law founded on the provision that the home of the family should be agreed upon by both husband and wife. Unfortunately, and I use that term advisedly, for eons of time, century upon century, woman has been regarded as the recipient rather than the giver. Because of that she was doomed to occupy a status inferior to that of "his male lordship", and thus has developed the law that the woman must live in the home which her husband provides. If I were to proceed,

* Names used herein are fictitious for the purposes of publication.

in response to a common sense viewpoint, and hold that a wife must provide a home, just as a wife is now required to contribute to the support of her indigent husband (as I have decided in *Hodson* v. *Picker,* 159 Misc. 356), would the husband be required to go where the wife has provided a home for him? I am quite sure that nowhere in the books can an expression be found upon that phase of human relationship. If my judgment is worth anything at all, I should say that " what is fat for the goose is fat for the gander ". But I did not make the law. I only interpret it, and I am bound by precedent too, to observe the principle of law which has been laid down and must be followed by the courts.

It has been abundantly shown by the testimony in this case that the dominant figure in this family unit is not the man. I do not know whether that is a compliment to him or a compliment to her or whether it is a compliment to either. She is a domineering young woman. That is my judgment, beyond peradventure of doubt. Moreover, she is an exacting young person, possibly due to being singled out by some one or many by reason of her pulchritude. I sometimes wonder whether I am living in a world of my own or whether I am living in a world of which I am a part. Sometimes figuratively I throw my hands up in the air. Here are these two young people who on the 22d of January, 1952, got into a squabble which resulted in the woman's hair being forcibly plucked from her scalp. Later a reconciliation took place and they continued to live together. That may be all right from the point of view of meeting one's obligations and vows taken at the time of the marriage ceremony. But it runs counter to what in my judgment seems decent, particularly in the face of the further testimony submitted by the woman that on the 12th of June, 1953, she had sexual intercourse with the man in the apartment which he had provided for her, and for which apartment he pays $80 a month rent. There seems to be no disagreement that during the interim, after the father-in-law had insisted upon a $10 increase in the rental, the respondent and petitioner, as she puts it, were " going out together ". Who, indeed, can fathom the emotional and mental, or lack of emotional and mental love of some human beings? Frankly, I cannot in this case. It is not understandable.

But I am governed by the law. A child is entitled to a mother's love, a mother's care, a mother's supervision, a mother's guidance, provided the mother is adequate and fit to give that care, supervision and guidance to the child. I

make this observation because I want it clearly understood that though the woman did work, though she can work, and is physically fit to work, her earnings are not to be at the cost of the child's needs. The primary obligation is that of the father. The father is not only obliged to give the child food, clothing and shelter, he is also obliged to give the child care, supervision and guidance by a fit and adequate person. It is evident *he* cannot do it because *he* is employed. Therefore, it follows that the mother is to be provided for by the father so that the child can have maternal supervision, guidance and care.

The rental of the apartment occupied by this young woman and her child is $65 a month, or was $65 a month until the father-in-law asked for an increase of $10 a month. There are four people occupying the apartment. I assume that $32.50 a month for this woman and her child would be a fair apportionment of the rental.

Differences will arise in so intimate a relationship as marriage. There are bound to be differences. Sometimes those differences break out into violence. But when those differences and that violence are afterwards passed over by both of the parties and the intimate relationship of marriage is re-established, it would seem to me that upon the re-establishment of intimate relations a new life is begun, and everything that went before is wiped out, more or less. It therefore follows than an offer of resumption of marital relations by one and its rejection by the other, would not entitle the rejecting party to support on the basis of means. The rejecting party would only be entitled to support on the basis of need, and I so find.